[Civ. No. 4090. Filed October 2, 1939.]

[94 Pac. (2d) 428.]

CITY OF PHOENIX, a Municipal Corporation, Appellant, v. R. F. KIDD, Appellee.

Mr. Hess Seaman, City Attorney, Mr. Wm. C. Fields, and Mr. Eli Gorodezky, his Assistants, for Appellant.

Mr. J. S. Wheeler, for Appellee.

LOCKWOOD, J.—The appellee in this case has filed a motion for rehearing. So far as the questions raised by this motion have been considered and determined by us in our original opinion, we see no reason to change our view of the law. There are, however, several questions raised by the motions in this and its companion cases (*City of Phoenix* v. *R. D. Price*, (Ariz.) 94 Pac. (2d) 433; *City of Phoenix* v. *Arnold Enriquez*, (Ariz.) 94 Pac. (2d) 434; *City of Phoenix* v. *Harvey T. Wilson*, (Ariz.) 94 Pac. (2d) 434), which were not suggested in the original briefs filed in this

court and apparently were neither raised, litigated nor considered in the trial court.

 For many years our rule was that we would not consider on an appeal any question which had not previously been considered and passed on by the trial court, and that cases must be presented before us on the same theory on which they were litigated in that court. *Tevis* v. *Ryan,* 13 Ariz. 120, 108 Pac. 461. However, in the case of *Munger* v. *Boardman,* 53 Ariz. 271, 88 Pac. (2d) 536, the court departed from its previous rule and held, in substance, that where the record showed in any manner that there was an issue which, if it had been properly litigated in the lower court, should and would have disposed of the action, we would consider and determine the appeal on it, notwithstanding it had not been called to the attention of either the trial or appellate court by the parties and did not correlate with the theory on which the case had been tried. If we are to adhere to that doctrine, (and the majority of the court is of the opinion that we should), both logic and justice would require that when such an issue is suggested, even on a motion for a rehearing, we should consider it and take such action as may be appropriate in the premises.

In our original opinion, we held that the budget law and the minimum wage law were not in any manner in conflict, but could and should be construed together. The effect of that construction was that the minimum wage law applied to all labor performed for a municipality until its budget was exhausted, but that thereafter any attempt on the part of the municipal officials to incur further liability on behalf of the municipality for labor, was void *ab initio,* and no recovery could be had by the parties furnishing such labor. We further held that this rule applied to the so-called "home-rule" municipalities in the same manner as to every other municipal corporation, and that the issue of es-

toppel could not be raised either by the municipality or by those furnishing labor to it under the circumstances set forth in the pleadings and stipulation on which this case was tried. We reaffirm the rules thus laid down and, therefore, need not discuss any of the new points raised on the motion for rehearing which question these principles.

There are, however, several new grounds on which the appellee contends, that admitting these principles correctly state the law, judgment should have been rendered in his favor because of certain facts appearing from the record, even though they were not pertinent to the theory on which the case was first presented. We shall consider and discuss these matters.

The principal question raised by them is when and under what circumstances the budget of appellant involved herein was exhausted. The first contention of appellee is, in substance, that even though the amount specifically budgeted for the wages involved in the present action was exhausted, the municipality nevertheless had many other funds budgeted for different purposes, and that if any surplus was left over from any of these funds, and particularly from what is known as the contingent fund, the budget out of which the wages sued for were originally intended to be paid was not, as a matter of law, exhausted until all of these surpluses had also been applied to the payment of such wages.

We had an analogous question before us in the case of *Batterton* v. *Pima County,* 34 Ariz. 347, 271 Pac. 720, 724. Therein we said:

"By its terms, where a county has funds actually on hand *at the time the budget is adopted,* not the proceeds of current taxes proposed by the budget, it is not prohibited from incurring extra obligations and liabilities not set forth in the budget to the extent of

such funds, if such obligations are otherwise author-ized by law.'' (Italics ours.)

We think the corollary to be drawn from this state-ment is that surplus funds on hand at the *end* of any fiscal year may not be used to pay deficits in other funds budgeted for at the *beginning* of such year, but may be carried over and used during the *ensuing* year for purposes authorized by law for which no budget estimate is made during that year. If surpluses in one fund may be used to pay deficits incurred in an-other fund, since it cannot be definitely known until the end of the fiscal year whether there will be a surplus in any particular fund or not, one desiring to furnish labor or material to a municipal corporation could never ascertain at the time he furnished them whether the contract was legal or not. We hold, therefore, following the reasoning of the Batterton case, that surpluses from any particular budgeted fund cannot be used to pay liabilities which should be charged to another budgeted fund for the current year, but may be carried over and used in the *succeeding* year for any purpose authorized by law, whether budgeted or not.

As we have stated repeatedly, the purpose of the budget law is not to aid the officials who manage the municipal government, nor the creditors who deal with it, but to protect the taxpayers, who are required in the end to foot the bill, from any liability incurred without their previous knowledge. This is done by the statutory provision that after the budget is made no indebtedness can be incurred in excess of the amount specifically budgeted for that express purpose, unless the funds to pay it are on hand at the beginning of the fiscal year as an unencumbered carry-over from the preceding year.

When then does a budget become exhausted? Is it when the money set up in the budget is actually

paid out to the creditors for purposes which the budget covers, or when obligations to pay therefrom are incurred in an amount equaling the total budget? We think there can be no question that it is the latter, for it is only in such case that the creditor is able to determine whether he may safely furnish goods or labor. Suppose, for illustration, the municipality has budgeted ten thousand dollars for the purchase of fire apparatus. It enters into a contract to purchase an engine for ten thousand dollars, of which one thousand is to be paid in cash and the other nine thousand at the end of six months. If we are to hold that the budget is only depleted by the sum of one thousand dollars at the time the contract is made, and the nine thousand dollars is not to be charged until it is actually paid, it is obvious that a situation might arise where the creditor, who in good faith had dealt with a municipality knowing that it had funds on hand to pay its debts, might find himself unable to collect a debt apparently valid when it was made, while a creditor, who had three months later sold another engine for nine thousand dollars cash, had been paid in full. If, on the other hand, as soon as an obligation has been incurred by a municipality, the budget is considered as encumbered to the full extent of the legal obligation, regardless of when the actual payment is to be made, all those dealing with the municipality in the future may ascertain definitely whether funds will be available to meet obligations in their favor.

 Applying this principle, it is apparent that when the appellant entered into contracts of employment with the various employees, and they had performed work for it up to their first payday, it was then indebted to them in the amount fixed by the minimum wage law. The record shows that this full amount was not paid. But under the principles above set

forth, the amount unpaid and due was an encumbrance upon the budget superior in rank to any indebtedness arising at a later date, and the mere fact that it had not been paid in cash did not alter this. It is obvious that under the record in this case a time would come before the end of the fiscal year when the amount actually paid from the budgeted fund involved in the present controversy, plus the amount which should have been paid under the minimum wage law, would equal the total amount budgeted, and it was at that point, as a matter of law, that the budget was exhausted, and any attempted future liability for labor which must be paid out of the fund in question was null and void. Each of the employees in this case, therefore, had due to him at the time of the exhaustion of the budget the difference between the amount which he had been paid and the amount which he should have been paid. The record fails to show precisely at what time the budget was exhausted under this rule, and the only way in which the exact amount due each of the employees can be determined is by going back over the payrolls of the municipality for the entire fiscal year and calculating the amount which should have been paid for the labor performed, at the rate fixed by the minimum wage law, and when the wages of all the employees at this rate, whether they had been paid or the payment withheld for any reason, equaled the amount of the budget, it was legally exhausted, and any payments made from it for services rendered thereafter were illegal.

The only question remaining then is as to those cases where the employee was entitled to further payment from the city up to the time the budget was exhausted for labor performed up to that time, and had also received illegal payment for labor performed after that date. Should he be given payment for the full amount which was due up to the time the budget was ex-

hausted, and be allowed to retain the money illegally paid, or should there be a set-off and counterclaim on account of the amount which he had received without authority of law? If the action were one for material rendered instead of for wages, we think there could be but one answer under the general principles involving the relation of debtor and creditor, for when a creditor sues for a sum which is due him, the debtor is always allowed to set off and counterclaim any amount which is due from the creditor to him when it arises from the same transaction. And there is no reason why this rule should not be applied to a municipality in circumstances like the present one.

It may be urged the rule is different when wages are concerned because the *status quo* cannot be restored, since the municipality cannot return to the laborer the work which he has performed. We cannot see where this affects the situation. Suppose, for example, a creditor furnishes a large quantity of paint to the municipality, in violation of the budget law, and the paint is used on municipal buildings. Certainly the *status quo* cannot be restored, for the paint cannot be returned to the creditor, yet no one would hold, if the contract to purchase was an illegal one, that the creditor might recover merely because he could not get back his paint, and the budget law makes no difference between liability for wages and liability for material; all are on the same footing. We have had an almost identical proposition before us in the case of *Peterson* v. *Rodgers,* 51 Ariz. 502, 78 Pac. (2d) 480, 482. Therein a certain public employee had been paid a large sum as salary in excess of that which the law permitted. The board of supervisors later discovered their error and refused to pay him the amount which was legally due for further service without charging against it the excess payment previously made. While the case was decided upon the express provisions of sections 781

and 783, Revised Code of 1928, as applied to the particular claim in question, we said:

"The undoubted purpose of section 783 is that those claiming an indebtedness in their favor from a county may not be permitted to collect their claims without first paying anything which they may owe the county. The principle is obviously just and is universally recognized in regard to dealings between private parties under the well known rule of setoff or counterclaim. *Indeed, we can see no reason why that rule should not be applied to obligations of counties, regardless of any statute, if we are to consider only the equities of the question.* Of course if the Legislature wishes to deny to a county the right of setoff or counterclaim it may do so, but we think we should not presume that the legislature will violate general principles of justice, and when the right of set-off is expressly affirmed and, indeed, made mandatory upon the board of supervisors of a county, we should not presume that there.are any exceptions to such a rule unless the act explicitly and specifically declares them." (Italics ours.)

We think this statement applies to cities with the same force and effect as to counties, and that it would be highly unjust to require the appellant to pay any sum which it may owe to any of the various employees without the privilege of setting off and counterclaiming any amount which the employees may owe to it, especially since the set-off and counterclaim arises out of the same transaction on which appellees are suing. And we see no reason why the same rule of law does not apply whether the salary illegally paid was at the rate of five dollars a day or five thousand dollars a year. The principle involved is the same.

It may be suggested that since the appellant in this case did not claim a set-off or counterclaim in the original pleading it should not be permitted to do so now. If we permit appellee to retry the case on an issue not raised by him at the first trial, justice requires that appellant be permitted to set up any de-

fense which it may have at the new trial in the lower court.

As intimated in our previous opinion, if the moral equities are such that the appellant should pay to the employees the minimum wage fixed by the highway commission and sued for by them, they have an ample remedy available. Whenever the situation has arisen that a creditor had a claim against the state, or any of its subdivisions, which was morally just, but legally unenforceable, the legislature of Arizona has never, to our knowledge, failed to remedy the situation by a relief bill. It has done this in at least one case where the precise question involved was the furnishing of money to the City of Phoenix, of which the city received the benefit but was prevented by the budget law from being legally liable for repayment. The legislature promptly, when the matter was called to its attention, not only authorized but directed the City of Phoenix to make the payment. *Palmcroft Development Co.* v. *City of Phoenix*, 46 Ariz. 200, 49 Pac. (2d) 626; Id., 46 Ariz. 400, 51 Pac. (2d) 921, 103 A. L. R. 811. We are certain that if the employees can convince the legislature there is a moral obligation on the part of the City of Phoenix, under all the circumstances, to pay them any amount, the legislature will promptly see that the payment is made. If, on the other hand, it deems that no moral obligation exists, the employees will not and should not recover.

Since it is impossible for us to determine precisely from the record before us in just which of the thirty-six causes of action involved in the present complaint the balance is in favor of the appellant and in which the balance is in favor of the appellee, it is necessary that the judgment be reversed and the case remanded with instructions to the trial court to permit the parties to amend their pleadings and to take an accounting

in accordance with the principles expressed herein, and to render judgment accordingly.

It is so ordered.

ROSS, C. J.—I agree with Judge LOCKWOOD'S conclusion.

McALISTER, J., Dissenting.—I am unable to concur in the conclusion reached by my colleagues in disposing of the motion for rehearing and will state briefly why.

If I understand it correctly, the holding is that under the minimum wage law it was the duty of the city to pay appellee and his assignors from and after August 1, 1937, the wages fixed by the highway commission on that day, and that this is true regardless of the fact that the budget adopted by it on July 20, 1937, for the fiscal year—July 1, 1937, to June 30, 1938—was based on the wage schedule then in force and payment of the new wage, an increase of 12½ per cent. over the one it superseded, would have had the effect of exhausting its budget before the end of that fiscal year. Because, therefore, there were not sufficient funds in the budget to keep all those paid out of it employed for the next eleven months at the new wage, the old rate was used, but the increase was earned by appellee and his assignors just the same and, hence, became, as a matter of law, encumbered each month, thus rendering it unlawful for the city to use it for any purpose other than to turn over to them. Inasmuch, however, as payment of the new wage from August 1, 1937, would have exhausted the budget somewhere near the first of April, 1938, and the city had no right to employ anyone after that date to be paid out of it, my colleagues say that any work done for the city by appellee and his assignors between that date and the close of the fiscal year, June 30, 1938, was

illegally performed, and that any money paid them therefor by the city was for the same reason unlawfully expended. Such being the situation, appellee and his assignors are, it is held, entitled to judgment for the increased wage from August 1, 1937, or whenever he or they began work, until the budget was exhausted, but the city is entitled to offset the amount due each worker with that the city illegally paid him following the exhaustion of the budget, that is, between April 1, 1938, or thereabouts, and June 30th thereafter.

The result of this view is that if the unpaid increase of 12½ per cent. the city owes appellee and his assignors for the time each worked prior to the exhaustion of the budget exceeds the amount he was paid after that occurred, he would be entitled to judgment for the difference, but if he was paid more after the budget was exhausted than the increase he had earned prior to that time amounted to, the same being encumbered and still due him, the city would be entitled to judgment for the difference. This means, of course, that appellee and those of his assignors who worked for the city any or all of the time between the exhaustion of the budget and the end of the fiscal year, June 30, 1938, will receive nothing whatever for the labor performed by them during those three months, because the city, having exceeded its budget in paying for these services, may recover from each the amount he received, and thus unjustly enrich itself to that extent, while appellee and his assignors are left helpless, since they can neither get back their labor nor retain what they have been paid for it. In other words, their labor during these three months amounts merely to a donation to the city. Even if this, as a cold question of law, be technically correct, the result it produces is so inequitable that a solution avoiding it ought to be found, if possible, and one of the propositions urged

in the motion for rehearing appears to me sound and when applied to lead to a more just and satisfactory conclusion.

There is no question but that after August 1, 1937, it was the duty of the city to pay all those who continued in that department the wages fixed that day for such labor by the highway commission, but there was another duty just as binding upon the city and that was either to secure an emergency appropriation to take care of the increase for the fiscal year, the sole alternative in case all employees were retained, or reduce its employees in the department to such an extent that the wages of those remaining during the balance of the fiscal year would not exceed the department's budget. This is true because the record discloses that appellee and his assignors were under the classified civil service of the city and in no other way could these regulations which have the force of law be observed. The city did not seek an emergency appropriation, so the only other course it could have followed that would have enabled it to pay the minimum wage, observe the budget law and at the same time comply with its civil service requirements was to reduce the number of its employees. It could have done this perhaps in two ways, first, by transferring some of them to other departments, a method that should have been followed as far as possible; second, by laying off those it could not transfer. In doing this it was necessary that it lay off those whose rank in the length of service or in efficiency, provided that department maintained efficiency records, were lowest, the others following in order until the wages of those remaining would not have exceeded the budget, and have retaind those who ranked first in time served or in efficiency. Rule VIII, section 1, item 2, of the Rules of the Civil Service Board of the City of Phoenix, approved April 3, 1936, says:

"Lay-offs shall be made in the order of the least seniority or lowest efficiency. In the absence of efficiency records, lay-offs shall be made in the order of least seniority. In departments maintaining efficiency records, approved by the Board, lay-offs may be made in accordance with the said efficiency records instead of seniority standing, the least efficient to be laid off first. The efficiency record for not less than the past six months' shall be used."

In no other way could the seniority or efficiency of those in the department have been observed or protected and unless it is, civil service has practically no reason for existence. If all the employees of the department in which appellee and his assignors were working were permitted to continue after the wage increase, in the face of the fact that their doing so would exhaust the budget several months before the end of the fiscal year, it is clear that one's seniority in rank or efficiency would give him no advantage. When it becomes apparent to the city authorities that the budget for any department is insufficient for the fiscal year or what remains of it, the situation is met practically by laying off employees with the lowest rank in length of service or efficiency and if in doing this a mistake is made either intentionally or inadvertently and one whose seniority or efficiency is higher than others on the payroll is laid off, that person, upon proof of this fact, would be reinstated by the court and awarded his salary for that period. *City of Phoenix* v. *Sittenfeld*, 53 Ariz. 240, 88 Pac. (2d) 83.

As I see it, therefore, the judgment should be reversed and the case remanded with direction to the trial court to ascertain first how much the payroll of the department in which appellee and his assignors were working should have been reduced after August 1, 1937, to bring its expenditures for wages within its budget for the remainder of that fiscal year, that is, until June 30, 1938, and, second, which employees

ranked lowest in length of service or in efficiency, provided an efficiency record was kept by the department. When these two facts are ascertained, judgment for the increase of 12½ per cent. should be rendered in favor of each employee in this action who, by reason of his seniority or efficiency was entitled to continue his employment for the remainder of the fiscal year from the day he began work, whether on August 1, 1937, or subsequent thereto.